Filed 6/7/16  In re Isis W. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ISIS W. et al., Persons Coming Under the Juvenile Court Law. | B267990 (Los Angeles County Super. Ct. No. CK64745) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARTHA G.,<br><br>Defendant and Appellant. | |

APPEAL from findings and an order of the Superior Court of Los Angeles County.  Terry T. Truong, Commissioner.  Affirmed.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Mary C. Wickham, County Counsel, R. Keith Davis, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

_____

Martha G. (mother) appeals from jurisdictional findings and a dispositional order removing her two children, Isis W. (Isis, born Apr. 2006) and L.G. (L., born Oct. 2014), from her custody. (Welf. & Inst. Code, § 300, subd. (b).)[1] She contends that insufficient evidence supports the juvenile court's finding based upon domestic violence. She further argues that substantial evidence does not support the juvenile court's removal order and that there were alternate reasonable means to protect the children short of removal.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Family's Prior Dependency History*

In 2006, Isis was declared a dependent of the juvenile court after being exposed to a physical confrontation between mother and Daniel W. (Daniel), Isis's father, during which Daniel kicked mother and they pushed each other. Isis was permitted to remain in mother's care during the case. Eventually, on November 1, 2007, the juvenile court terminated jurisdiction, granting joint legal and physical custody to mother and Daniel. At the time, mother and Daniel were both 16 years old and Isis was three months old.

In 2013, the Los Angeles County Department of Children and Family Services (DCFS) received a referral, accusing Salvador G. (Salvador), mother's boyfriend and allegedly L.'s father, of emotionally abusing Isis and accusing mother of being generally neglectful. Daniel reported that when he dropped Isis off at mother's home, Salvador threw a wooden block at his car. He said that Isis was in his car during the incident and mother did nothing about it. Daniel also claimed that there was drug activity occurring in the home. DCFS investigated and determined that the allegation against Salvador was unfounded and that the allegation against mother was inconclusive.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

*Current Case – Detention Report*

On October 29, 2014, DCFS received a referral alleging that mother and Salvador had a heated argument on September 21, 2014. It was reported that Salvador assaulted mother by hitting her, pulling her hair, and pinning her down on her stomach, and that mother was eight-and-a-half months pregnant with L. at the time. At the time of the referral, Isis was eight years old and L. was just 10 days old.

Interview with Isis's Therapist

A DCFS children's social worker (CSW) interviewed Isis's therapist, who reported that the child had not discussed the altercation during their sessions; however, Salvador had informed him about it and admitted that it had occurred while mother was pregnant. The therapist indicated that he had been working with Isis for two-and-a-half years and that the child had not disclosed anything about domestic violence, substance abuse, or physical abuse or neglect. Isis's school had referred the child for services, and the therapist said that he met with the child at school weekly. The therapist reported that he had no trouble getting in touch with Daniel, but had a difficult time reaching mother; he had only spoken with her once away from the child's school. Isis reported during therapy that she did not feel comfortable with Salvador and did not like him very much.

Interview with Landlord

Mother and Salvador's landlord told DCFS that mother had moved in with Salvador about two months earlier and she had not heard them fight.

Interview with Salvador

Salvador told the CSW that he lived with mother and L., who he identified as his and mother's child. Salvador said that Isis, L.'s paternal grandmother, and L.'s paternal uncle also lived in the home. He said that mother and Daniel shared custody of Isis and mother cared for her every other week. Salvador denied allegations of domestic violence. He said that he and mother only had arguments but no physical altercations. He accused Daniel of making the referral and said that he had had problems with him in the past. No one else was home when the CSW visited the residence, but he observed the two-bedroom apartment to be clean and organized.

Salvador admitted smoking marijuana, but said that he had a medical marijuana card and only smoked outside the home and not around the children. He admitted that he was on probation for selling marijuana when he was in high school, but said that his probation officer knew about his marijuana smoking.

Interview with Daniel

On October 30, 2014, the CSW interviewed Daniel, who reported that mother had told him several weeks earlier that she had moved to her sister's home because she and Salvador had gotten into a fight. Mother told him that they had argued about mother using Isis's cellular telephone, which Daniel had purchased for Isis. Daniel said that mother told him that Salvador had lashed out at her physically and that Isis witnessed the altercation before others in the home intervened.

According to Daniel, Isis told him that she had seen Salvador pin mother to the floor during the altercation. The child also said that she had heard them argue. Daniel reported that this was the first time he had heard about mother and Salvador engaging in domestic violence. He expressed concern for Isis's safety if they had an ongoing problem with domestic violence. Daniel acknowledged that he and mother previously had an open DCFS case regarding their domestic violence, but said that they had completed all of their programs and the case was closed. He and mother communicated little since she started her new relationship with Salvador because Salvador was immature and insecure and did not like mother speaking with him.

Daniel reported that he and mother had had joint custody of Isis since 2007, when the child's prior dependency case had closed. Daniel said that he linked Isis with counseling services to help her deal with his and mother's separation; Isis saw her therapist at school once a week.

Interview with Isis

The CSW interviewed Isis at her school that same day. She had no visible signs of abuse or neglect. She reported that she had good grades, but was sometimes tardy arriving to school, which the school's clerk confirmed. She lived with mother and Salvador and visited Daniel. She reported that Salvador sometimes got mad at mother

4

and yelled at her, but she had never seen him hit her. Isis said that Salvador went outside when he got mad and that she had heard mother and Salvador argue in their bedroom.

She acknowledged that she and mother left to go and stay with her aunt after mother and Salvador got into a heated argument. She reported that the incident occurred when mother was still pregnant and that the paternal grandmother and a paternal uncle had to intervene. While she felt uncomfortable around Salvador, she denied being afraid of him. She denied that Salvador ever hit her or L. or that the police had ever been to the home. She indicated that she felt safe at both of her parents' homes, but reiterated that she did not feel comfortable with Salvador when he became mad at mother.

Meeting with Mother, Salvador, and L.

Later that day, the CSW met with mother, Salvador, and L. Mother acknowledged that she and Salvador had had a heated argument while she was pregnant, but she denied that they ever had a physical altercation. She claimed that she left home to go and stay with her sister due to financial difficulty and that she returned to living with Salvador after the children's maternal grandfather helped her purchase a car. She admitted that Salvador smoked marijuana because of his insomnia and lack of appetite, but denied that he did so in the home or around the children. She reportedly had taken counseling and parenting classes during her family's prior dependency case.

Mother and Salvador agreed to a safety plan with DCFS under which they would obtain a crib for L., submit a drug test the following day, and refrain from any domestic violence disputes or altercations.

Interview with L.'s Paternal Grandmother

The CSW interviewed L.'s paternal grandmother, who reported that mother had been in and out of her home since she became pregnant and had moved back and forth between her home and the maternal grandfather's home. She had heard mother and Salvador argue before, but she had never seen them in a physical altercation. She acknowledged that there was an incident about two months prior when mother and Salvador had a heated argument and she had to intervene. Mother then went to stay with the maternal grandfather for about two weeks while things cooled down, before she

5

returned to their home. While she was working out of the home from 7:00 a.m. until 8:00 p.m., she was unaware of any similar incidents occurring between the parents since then. She reported that mother and Salvador were currently unemployed and that she had told them that they needed to start paying rent.

She denied that Salvador had been aggressive towards her and was unaware of him having a drug problem. However, she had noticed that Salvador had lost his temper at times since the death of the paternal grandfather in 2012. He was trying to get into counseling to deal with the loss of his father. She also reported that Salvador felt insecure in his relationship with mother because mother already had a daughter from a previous relationship; Salvador was jealous of Daniel. But, she had noticed that Salvador was acting more mature and responsible since L.'s birth. She believed that he was a good parent.

Follow-up with Mother

On November 7, 2014, the CSW attempted to call mother and Salvador; he left a voicemail message asking them to call back.

On November 19, 2014, the CSW received notice that the parents had failed to appear for their scheduled drug test on October 31, 2014.

On November 20, 2014, the CSW went to the parents' residence unannounced to try to locate the family; they were not home. The CSW left a business card on the door with a written message asking for mother and Salvador to call him. He also made efforts to reach them by calling the paternal grandmother but to no avail.

Follow-up with Daniel

The CSW spoke to Daniel on December 4, 2014. Daniel accused mother of lying to the CSW about her and Salvador's previous incident of domestic violence in order to avoid detention of the children. Daniel complained that mother was difficult to get in contact with, and he said that he only got Isis back in his care by showing up at her school unannounced and telling mother that he was taking the child with him.

According to Daniel, Isis told him that when mother picked her up from school the previous week, the child noticed that mother had a bump on her head and was crying.

6

When Isis asked mother about the injury, mother claimed that she had gotten dizzy and accidentally bumped her head. Daniel expressed concern that the bump may have been caused by another incident of domestic violence. He was thinking about filing for custody of Isis in family court.

Follow-up with Mother

On January 12, 2015, the CSW went unannounced to the family's residence and found them at home. Isis was at school, but the CSW observed L. to have no visible signs of abuse or neglect. Mother and Salvador denied any incidents of domestic violence. Mother denied substance abuse, although father admitted that he was still smoking marijuana and provided the CSW with a new doctor's recommendation issued on December 12, 2014. Salvador reported that he was currently enrolled in a substance abuse program and parenting classes. Both parents agreed to submit to a drug test the following day.

The CSW briefly spoke with a paternal uncle who was present and who denied any knowledge of domestic violence or substance abuse by the parents.

The parents were supposed to go to the DCFS office on their way to go drug test on January 13, 2015, in order to pick up a letter prepared by DCFS that would serve as mother's identification at the testing facility. When they failed to appear, the CSW brought the letter to their residence, but there was no response at the door. A neighbor told the CSW that she did not know the family well but had heard Salvador yelling at mother before as if they had been in an argument.

Follow-up with Isis

The CSW interviewed Isis at her school on January 14, 2015, and again observed that the child had no visible signs of abuse or neglect. Isis said that mother and Salvador no longer argued like they had previously, and she denied witnessing any physical altercations between them. She also denied seeing any bumps or bruises on mother or being fearful of Salvador.

Follow-up with Salvador

That same day, the CSW spoke with Salvador's probation officer. He said that Salvador was put on probation in 2012 as a juvenile for possession of a controlled substance for sale. The probation officer confirmed that Salvador was ordered to complete a substance abuse program and submit to random drug tests and that he had tested positive for marijuana on December 2, 2014. He indicated that the criminal court did not recognize a physician's recommendation for marijuana unless it was for a severe medical problem; he was aware that Salvador had such a recommendation.

Drug Test Results

On January 16, 2015, DCFS received the results of the drug tests—mother and Salvador both tested positive for marijuana. The CSW attempted to contact mother and Salvador on January 20, 2015, but one telephone number that they had provided remained disconnected and the other did not have voicemail set up; the CSW was unable to leave a message.

Follow-up with Isis's School

On January 20, 2015, the CSW went to Isis's after-school program and spoke with a supervisor. She described mother as "'wishy washy'" and complained that she had had issues with mother not picking up Isis on time and being unable to get in touch with mother.

While at the after-school program, the CSW noticed mother parked outside across the street from the school and approached her car. The CSW expressed concern to her regarding her positive marijuana test; mother acknowledged smoking the drug a few days while Isis was visiting with Daniel. She said that she took some of Salvador's marijuana without him knowing and smoked it because she was stressed and missing Isis. She claimed that she did not usually smoke marijuana and had not done so since December 2014. She did not believe that her smoking marijuana had affected her ability to parent her children and denied that the children were ever exposed to her or Salvador smoking. Later that day, the CSW met with mother and Salvador at the DCFS office, where they agreed to meet again on January 22, 2015.

Decision to File Nondetained Petition

At the subsequent meeting, Salvador provided DCFS with a letter indicating that he had enrolled in an outpatient drug treatment program on January 6, 2015. Mother said that she also tried to enroll, but was informed that she needed to have a full physical examination first. Even though L. exhibited no visible signs of abuse and neglect, DCFS was concerned that mother had not been truthful about her substance abuse and about the parents being under the influence while caring for the children. The CSW also indicated that DCFS's ability to offer the family voluntary services was negatively impacted by mother's and Salvador's evasiveness and lack of full cooperation during its investigation. A decision was made to file a section 300 petition in the juvenile court and provide the entire family with family maintenance services due to concerns regarding the parents' domestic violence and substance abuse.

*Section 300 Petition*

On January 28, 2015, DCFS filed a section 300 petition on behalf of Isis and L. The petition alleged that the children were at risk as a result of mother and Salvador's marijuana use.

*Pretrial Proceedings and Further Investigation*

Mother and Salvador appeared at the detention hearing and were appointed counsel. The juvenile court deemed Daniel to be Isis's presumed father and Salvador to be L.'s presumed father. Both children were released to the custody of their parents. The juvenile court ordered DCFS to provide mother and Salvador referrals for drug treatment and testing programs. It also scheduled separate dates for a pretrial conference and contested jurisdictional hearing.

*Amended Section 300 Petition*

On February 11, 2015, DCFS filed an amended section 300 petition, which additionally alleged that the children were at risk as the result of mother and Salvador engaging in violent altercations in the presence of Isis.

9

*Jurisdiction/Disposition Report*

DCFS reported that L. remained in mother and Salvador's custody, and mother and Daniel continued to share custody of Isis.

Interview with Isis

In a new interview with Isis, she reported that Salvador sometimes got mad at mother and yelled. When she was asked what the yelling was about, Isis replied that she did not know, but that sometimes she would hear mother cry; one time she saw mother cry.

Regarding the altercation she witnessed between mother and Salvador, Isis reported that the incident occurred when she was in second grade, on a Saturday morning when she was watching a movie in her room. She heard mother yelling and went to the living room, where she saw Salvador pulling mother's hair. She said that Salvador would not let go of mother's hair. Isis said that she tried to help mother by pulling her from his arm, but Salvador did not stop. She then went to the paternal grandmother's room and told her that mother and Salvador were fighting. The paternal grandmother intervened and told Salvador to stop and to leave the home. Isis was scared when she saw Salvador pulling mother's hair. Since Salvador did not want to leave the house, mother took her to the home of her aunt and grandfather. At the time, L. had not yet been born; she was in mother's "'stomach.'" Her one wish was for mother and L. to be happy and for mother and Salvador not to fight anymore. Isis did not feel comfortable around Salvador, but was not afraid of him. She denied being abused or that the police had been to the home. She denied seeing mother smoking anything.

Mother and Salvador's Failure to Interview

Mother and Salvador failed to appear for a scheduled interview with DCFS. The dependency investigator (DI) knocked several times on the parents' door, but no one answered (even though a neighbor reported that the parents were home). The DI later received a message back at her office stating that the parents wanted to cancel the interview. The DI made multiple attempts to reschedule the interview, but reported that the parents remained uncooperative and had not returned her messages.

10

Interview with Daniel

During an interview with Daniel on February 3, 2015, he expressed concern that mother's marijuana use would affect her ability to care for the young children.

Interview with the Paternal Grandmother

The paternal grandmother recounted an incident when Isis went to her room and told her that mother and Salvador were fighting. She confirmed that she told them to stop and asked Salvador to leave, but denied seeing Salvador pulling mother's hair. She said that she believed Isis more than Salvador and that if Isis said the hair pulling happened, then "'it probably did.'" The paternal grandmother also confirmed that Salvador refused to leave the home after the incident, so she took mother and Isis to the home of maternal relatives. She did not observe marks or bruises on mother following the incident. The paternal grandmother reported that she had heard mother and Salvador arguing and raising their voices to each other, but she had not heard them cursing at one another. She believed that mother and Salvador would benefit from counseling.

DCFS Conclusion

DCFS noted that Isis was eight years old and that L. was only three months old; the children's "tender years" and the absence of adequate supervision from mother and Salvador posed an inherent risk to their physical health and safety. DCFS noted that when mother smoked marijuana in December 2014, she was taking care of L.

*Addendum Report - Daniel Asserts Paternity of L. (Feb. 20, 2015)*

Although the juvenile court had previously deemed Salvador to be L.'s presumed father, Daniel informed DCFS on February 16, 2015, that he had previously asked mother for a DNA test to determine L.'s paternity. Mother had avoided having the test for months, until January 7, 2015, when he collected a DNA sample by swabbing the child's mouth. He received the results a week later and they indicated that he could not be excluded as L.'s father. He provided DCFS with a copy of a "Personal Paternity Analysis," which he reportedly obtained from Identigene. It indicated that the probability of a genetic relationship between L. and Daniel was "99.99%." Daniel told the DI that he did not say anything earlier because he had been threatened by mother that if he said

11

anything, she had associates who knew where Daniel lived. She told him that it was not a good idea for him to bring the test results to anyone's attention. However, Daniel told the DI that he now wanted to take a paternity test and said that he was willing and able to care for both children if mother was unable to do so.

On February 20, 2015, DCFS reported that mother and Salvador had not made any efforts to contact the DI to arrange for an interview.

*Juvenile Court Hearing (Feb. 20, 2015)*

Daniel made his first appearance in the juvenile court on February 20, 2015, and was appointed counsel. He requested that the juvenile court deem him L.'s presumed father. The juvenile court ordered DNA testing of L. and Salvador to occur to determine L.'s paternity. It also ordered that Daniel have unmonitored visits with L.

*Addendum Report (Mar. 5, 2015)*

<u>Interview with Mother</u>

DCFS interviewed mother on February 23, 2015. She questioned why Isis would say she saw Salvador pulling mother's hair and accused the child of sometimes not telling the truth. Mother denied having a physical altercation with Salvador. She claimed that they were arguing over finances. She said that her relationship with Salvador had improved and that they no longer argued like they had before.

Mother admitted smoking marijuana over three to four days in December 2014. She took the marijuana from a drawer in the bedroom she shared with Salvador and smoked it outside while L. slept. When asked why she smoked knowing that DCFS was involved with the family, mother claimed that she had reached her "'lowest point,'" and was not sleeping after things she had in storage were stolen. She also said that she was missing her mother, who died in 2012. Mother said that she did not usually smoke marijuana and had not done so since December 2014. She felt guilty for testing positive for marijuana and did not know what she was thinking when she chose to smoke it. She denied having a problem with the drug and claimed that she had just made a poor decision.

12

Mother was aware that Salvador had been arrested for possession of drugs. She said that he smoked marijuana due to insomnia and lack of appetite ever since his father passed away in 2012. She was working with Salvador to try to find other ways he could deal with not being able to sleep or eat, and she was trying to get him to enroll into counseling so that he could deal with his father's death.

She claimed that Daniel was lying about L.'s DNA test and that she had never authorized it. She claimed that Daniel had sexually abused her in January 2014, but she never filed a police report because he had threatened to take Isis away from her. She acknowledged that he could be L.'s father, although she also said that she never thought about him being the father until the last court hearing. She had learned nothing in the domestic violence program she attended during her prior dependency case. She said she was "'a kid'" at the time and the counselor "'just gave [her] a certificate and that was it.'" She denied any current mental health diagnosis, but she reported feeling anxious and sad at times and said that she was looking into enrolling in therapy.

<u>Interview with Salvador</u>

DCFS interviewed Salvador on February 23, 2015. He denied ever engaging in domestic violence with mother. He admitted that during a verbal altercation with mother in 2014, he told her to "'get the fuck'' out of his house. He also admitted that their argument had involved his belief that mother was talking to Daniel. But he said that they did not argue anymore. He acknowledged that Isis possibly heard them arguing that day in June 2014,[2] and he admitted that he should have left the home that day.

He was not aware that mother had smoked marijuana and said he was surprised when she tested positive for it. He did not have any marijuana in the home and kept it in his car or elsewhere. But, he agreed that Isis could have had easy access to the marijuana that he kept in his bedroom drawer, just as mother had. The DI explained to Salvador that although he and mother claimed not to be smoking marijuana in front of the children,

---

[2]    It is unclear whether this "June" incident is actually the same incident as what occurred in September 2014 (when mother was pregnant with Leilanie) or whether this was a separate instance of domestic violence.

13

they were under the influence when caring for the children. Salvador said that he felt badly and would refrain from smoking marijuana.

Salvador indicated that he started smoking marijuana once or twice a week soon after his father and cousin were killed in 2012. Their passing affected him very much and he did not sleep or eat and needed help. He denied seeking counseling or therapy to deal with the deaths of his relatives. He believed that he was L.'s father.

*Addendum Report (Apr. 20, 2015) – Updated Paternity Regarding L.*

On March 12, 2015, DCFS received the paternity testing results, which indicated that Salvador was not L.'s biological father. DCFS requested that the juvenile court "update" its paternity findings regarding L.

*Removal from Mother*

On May 4, 2015, DCFS sought and received authorization to remove the children from mother. Mother failed to submit to several scheduled drug tests. She reportedly did not respond when the CSW inquired regarding her compliance with drug testing and did not answer or return the CSW's telephone calls. DCFS further alleged that mother was being uncooperative by not making the children available to meet with the CSW. The CSW reported making several unannounced calls to mother's residence. She had observed the screen door to the residence locked, with the front door opened, the television and lights on, but no one answered the door. DCFS also reported that mother was noncompliant with court-ordered visitation between Daniel and Isis. Mother claimed that Isis was not safe with Daniel.

DCFS reported that on March 31, 2015, Daniel had gone to Isis's school to pick her up, but mother was at the school even though it was not her week to have custody of the child. She reportedly started a fight with Daniel and called the Long Beach Police Department. An officer responded to the school and talked to both parties; no report was generated. DCFS reported that as the incident was occurring, Daniel called the CSW to inform her of the situation. The CSW then phoned mother, but mother failed to answer her telephone. Daniel reported the incident took place in the presence of Isis and other students and their parents. The CSW spoke to the officer and informed him that mother

should not have been at the school due to the terms of the custody order. DCFS further reported that mother had agreed to a visitation schedule for visits to occur between Daniel and L., but she had failed to comply since the court order for visits had been issued.

DCFS reported that during a home visit on April 10, 2015, Isis informed the CSW that she did not feel safe in Daniel's home. She alleged that Daniel's girlfriend, Melody R. (Melody), and Daniel had taken her to an "'adult party,'" where the women's "'private parts'" were showing. The CSW asked Isis what she meant by "'private parts,'" but she could not explain. The CSW noted that Isis was looking down during this contact and seemed to be trying to remember the words she was using. The CSW reminded Isis that she had previously seen her twice with Melody and had observed positive interaction between them. While speaking with Isis, the CSW noticed mother standing behind the door listening in, but did not believe that the child saw what mother was doing. The CSW told Isis that she was concerned that she had been coached to say these things and that she planned to talk to mother about involving the child in case issues.

On April 14, 2015, the CSW visited Isis at Daniel's home. Isis recanted her previous allegations about not feeling safe there and being hit by Melody. She did say that Melody had hit her one time, but she could not remember when or which part of her body was hit. She reported Daniel as unaware of her being hit. The CSW informed Isis that neither parent would be saying negative things or lies to her about the other parent. DCFS described Daniel as being cooperative and indicated that he and Melody submitted to a drug test on April 17, 2015, with negative results.

On April 29, 2015, Daniel informed the CSW that he had seen Isis with a babysitter and that the child said that she did not want to talk to him as a result of what had happened in court. DCFS opined that mother was discussing the case with the child and thereby influencing her relationship with Daniel. He said that he was confused about what had been happening with the dependency matter and did not understand why mother kept putting things in Isis's head. He denied that anyone had abused the child and called the accusations a complete lie. DCFS also received a telephone call from Isis's therapist expressing his frustration that he had not had contact with Isis. Daniel accused mother of

15

not complying with the visitation schedule and complained that mother was not following court orders without any consequences.

On April 30, 2015, Melody provided the CSW with a copy of a restraining order granted to her the prior day, protecting her from mother for a period of two years. Melody also provided a copy of the video of an incident that reportedly led to the issuance of the restraining order.

*Detention Report and Hearing (May 2015)*

On May 13, 2015, two CSW's and two Los Angeles County Sheriff's Deputies went to mother's home to serve her with a copy of the removal order authorized by the superior court. DCFS reported that mother and Salvador refused to answer the door until the deputies announced their presence. Mother and Salvador then came out and were served with the removal order.

On May 18, 2015, the juvenile court granted DCFS's request pursuant to section 385 and detained the children from mother. Isis remained in Daniel's custody, and the juvenile court found Daniel to be L.'s "declared father" and placed her in Daniel's home as well.

*Jurisdiction Hearing*

On May 21, 2015, the juvenile court began contested proceedings regarding the amended section 300 petition.

Mother testified that she and Salvador had argued in June 2014. She acknowledged that it was not the first time that they had argued loudly, but denied that Salvador had previously become physical with her. She remembered arguing with Salvador that day and believed that if Isis said that she saw Salvador pulling her hair, then she was telling the truth. She denied that she was presently living with Salvador. She acknowledged having a positive drug test in January 2015, but claimed that she was not subsequently notified by the CSW that she need to call a specific telephone number and test if her letter came up. At some point after she was informed of drug testing protocol, she had been calling daily, but her letter had not come up. She denied using marijuana since testing positive on January 13, 2015.

16

Mother was now enrolled in drug counseling and had been unable to enroll earlier because of "issues" with her medical insurance. She knew that Salvador had been smoking marijuana for "health problems," but denied that he ever used around the children. She was never suspicious about Salvador's drug use and never questioned him about it.

The matter was then continued.

*Ex Parte Application (§ 385)—Allegations Against Daniel*

Following the morning hearing, DCFS responded to a referral alleging sexual and emotional abuse of Isis by Daniel. Isis told the investigating CSW that she did not want to be with Daniel because he had grabbed her away from mother and told her that she was ignorant. Isis said that she did not know why Daniel did this, but the child knew of a foster home she could go to, near Norwalk. She said that mother had a friend who worked as a foster parent.

Isis also reported that Daniel went into the bathroom and looked at her bottom when she took a shower or changed her clothes. Then she stated that he looked at her bottom only when she had her clothes on. It made her feel uncomfortable. Isis agreed to live with Melody if Daniel left the home.

Daniel reacted to the allegations in disbelief and said that everything had been fine before they went to court. He said that the allegations were coming right after he had allowed Isis to have a conversation with mother prior to the court hearing. He denied going inside the bathroom when the child showered. He accused mother of coaching the child, but said that he was willing to cooperate with DCFS's investigation. He agreed to move out of the home and allow the children to stay with Melody.

*Last Minute Information for the Court*

On May 27, 2015, DCFS reported that Isis said that she had not liked how Daniel had talked to her in court on May 21, 2015, and that was why she had not wanted to go home with him. She provided no further details, but stated, "'He didn't do that stuff to me.'" DCFS further reported that on May 22, 2015, Isis could not wait for Melody to arrive at the DCFS office and ran to her and hugged her for more than 10 minutes while

17

she cried until the CSW asked them to go into the office instead of being outside. Daniel also visited the child at the office and she hugged him and said that she missed him.

*Court Order for Psychological Assessment of Isis*

On May 28, 2015, the juvenile court ordered a psychological assessment of Isis pursuant to Evidence Code section 730. It ordered that the assessment address the relationship between mother and Isis concerning "whether mother's influence to alienate the child from her father is at issue."

*Last Minute Information for the Court*

DCFS documented that mother and Salvador were referred to drug testing on February 19, 2015. On July 2, 2015, mother and Salvador failed to appear for scheduled drug testing.

*Evidence Code Section 730 Evaluation*

Dr. Nancy Kaser-Boyd conducted a forensic psychological evaluation of Isis. Isis informed Dr. Kaser-Boyd that she missed living with mother. She "[k]ind of" liked Salvador, but wanted him not to get mad at mother.

When asked if she had seen domestic violence, Isis repeated that Salvador had pulled mother's hair and that she had run into the paternal grandmother's room and told her what was happening. Isis said that she was placed with Daniel because she had been "missing a little tiny bit of school," which Dr. Kaser-Boyd characterized as "an understatement of the actual facts." Isis was aware that mother had not wanted Daniel to pick her up at the end of the day. When asked why she thought this was, Isis said that mother said it was because she loved her. She wanted to live with mother and visit Daniel. She would do anything to forget about the time she was sad because mother and Salvador had been fighting. She wanted mother and Daniel to be friends.

Dr. Kaser-Boyd also interviewed Daniel. He informed her that mother had a dark side and had made threats to him, "'like her friends know where I live and I better watch my back.'" Daniel believed that mother was coaching Isis in court because Isis told her attorney at a court hearing that Daniel was looking at her in a way that made her feel uncomfortable.

18

Dr. Kaser-Boyd noted that Isis had been sensitized to issues involving the juvenile court and had volunteered that mother had done all her classes and that Salvador had done drug classes and anger management. She opined that Isis would most likely only know this by hearing it from mother and because the child felt close to mother, it was possible that she would be overly susceptible to mother's influence. She indicated that there was no indication of risk in Daniel's home.

*Resumed Jurisdictional Hearing*

The jurisdiction hearing resumed on April 19, 2015.

Mother testified that Salvador had never physically assaulted her and never pulled her hair. She accused Daniel of coaching Isis to make that allegation. Mother claimed that Isis had told her that she would be in trouble with Daniel unless she said those things. She also claimed that she had tape-recorded the child outside the courtroom making accusations against Daniel. Mother acknowledged hearing the juvenile court's prior order that there was to be no discussion of the case with the children, but she maintained that she had not discussed the case with Isis; Isis had discussed it with her.

Mother's attorney then argued for dismissal of the domestic violence and drug counts involving mother. She said that any domestic violence had occurred over a year ago. The children's attorney argued for the petition to be sustained based on Isis's account of the physical altercation while mother was pregnant and mother and Salvador's continued verbal altercations in front of the children. DCFS argued that mother was not credible and noted that mother had missed multiple scheduled drug tests; she had yet to provide any clean tests to DCFS.

The juvenile court sustained an amended version of the domestic violence allegation, which alleged that mother and Salvador had a history of verbal and physical altercations in Isis's presence, including a June 2015[3] incident when Salvador pulled

---

[3]     Again it is unclear whether the juvenile court is actually referring to an incident that occurred in June 2014 and/or September 2014 or whether there was more than one instance of domestic violence.

19

mother's hair.  This domestic violence placed the children at risk of harm.  The remainder of the petition was dismissed.

*Disposition*

The juvenile court proceeded to disposition.  Mother argued for "at least a home-of parents order" as the evidence did not support removal from mother's custody.  DCFS argued that it was extremely concerned about mother's behavior and wanted her in individual counseling and to have a "psych assessment."  While the case initially was about domestic violence and marijuana, it "took a turn for the worse, based on mother's discussions with [Isis] . . . in and throughout this case."  DCFS asserted that mother's actions showed that she was incapable of caring for the children and that they would be at extreme risk if released to her.  The children submitted on DCFS's recommendations.

After entertaining oral argument, the juvenile court declared the children to be dependents of the court and removed them from mother's custody, leaving them with Daniel.

*Appeal*

Mother's timely appeal ensued.

## DISCUSSION

I. *Jurisdictional Findings*

Mother challenges the juvenile court's findings related to her domestic violence with Salvador.

A. Standard of review and relevant law

As the parties agree, we review the juvenile court's findings for substantial evidence.  (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1649; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393; *In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.)

Jurisdiction is appropriate under section 300, subdivision (b), where there is substantial evidence that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure to inability of his or her parent or guardian to adequately supervise or protect the child."  (§ 300, subd. (b)(1).)  Three elements must exist for a jurisdictional finding under section 300,

subdivision (b): (1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "'serious physical harm or illness'" to the child, or a "'substantial risk'" of such harm or illness. (*In re J.O.* (2009) 178 Cal.App.4th 139, 152.)

While section 300 generally requires that a child be subject to a "defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. [Citation.]" (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215–1216.)

Exposure to domestic violence may serve as the basis of a jurisdictional finding under section 300, subdivision (b), as children can be put at substantial risk of harm. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194; *In re R.C.* (2012) 210 Cal.App.4th 930, 941; *In re T.V.* (2013) 217 Cal.App.4th 126, 134; *In re Sylvia R.* (1997) 55 Cal.App.4th 559, 562.) "'Both common sense and expert opinion indicate [that] spousal abuse is detrimental to children.' [Citations.]" (*In re E.B.* (2010) 184 Cal.App.4th 568, 576.) It is a form of secondary abuse; children are affected by what happens around them as well as by direct harm. (*In re Heather A.*, *supra*, at p. 195, fn. 11; see also *In re Sylvia R.*, *supra*, 55 Cal.App.4th at p. 562.)

B. Analysis

Based upon the evidence presented here, the juvenile court had more than sufficient evidence of domestic violence to sustain the allegations under subdivision (b) in the amended section 300 petition. (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 600–601.)

As set forth above, Isis witnessed an altercation between mother and Salvador before others in the home were forced to intervene. According to Daniel, Isis said that she had seen Salvador pin mother to the floor. By other accounts, she had seen Salvador pulling mother's hair and would not let go. Isis tried to help mother, but Salvador would not stop what he was doing, so she went to the paternal grandmother for help. Later, the paternal grandmother took mother and Isis to mother's relatives' home so mother and

Salvador could have a cooling off period. Isis reported that she felt uncomfortable around Salvador. And, her one wish was for mother and Salvador not to fight anymore.

Taken together, this evidence amply supports the juvenile court's order sustaining the section 300, subdivision (b), allegation against mother arising out of domestic violence.

In urging us to reverse, mother argues that the "hair-pulling incident" is too remote to support the juvenile court's findings at the August 2015 jurisdictional hearing. She claims that there is no evidence of a similar incident since and no evidence that one was likely to occur again. The problem for mother is that her issues with anger and instability go beyond this one incident. This is the second time Isis has been declared a dependent as a result of her exposure to domestic violence in which mother was a participant. And mother acknowledged that she learned nothing in the domestic violence program she attended during the 2006 dependency case.

Perhaps that explains why mother continues to have problems with anger. She threatened Daniel. Even though it was not her custody week, she went to Isis's school and started an argument with Daniel that led to the police being called to the school; that incident took place in Isis's presence. As recently as April 2015, Melody was granted a restraining order against mother.

Salvador too has anger management issues. His mother reported that there had been times when Salvador lost his temper since his father passed away in 2012. Salvador also felt insecure in his relationship with mother; he was jealous of Daniel.

Moreover, mother and Salvador have continued to engage in conflicts since the June 2014 incident. Isis reported that Salvador sometimes gets mad at mother and yells at her. Isis also reported that she could hear mother cry; once, she saw her crying. Daniel reported that in December 2014, Isis noticed that mother had a bump on her head and was crying. Daniel was concerned that the bump may have been the result of domestic violence. A neighbor had heard Salvador yelling at mother. And, the paternal grandmother reported that she had heard mother and Salvador arguing ad raising their voices to each other.

All of this evidence lends support to the juvenile court's jurisdictional findings and does not aid mother's contention that any prior domestic violence is unlikely to recur.

It follows that *In re Daisy H.* (2011) 192 Cal.App.4th 713 is distinguishable. In that case, there was only one incident of domestic violence that was not witnessed by the children and that took place seven years before the section 300 petition was filed. (*In re Daisy H., supra,* at p. 717.) In contrast, at least one incident of domestic violence occurred in front of Isis in 2014. Since then, anger management and conflict between mother and Salvador continue to be a problem for this family.

We reject mother's suggestion that the juvenile court relied upon the wrong subdivision (subd. (b) as opposed to subd. (c)) when making its findings. The comments she cites in her opening brief were made when the juvenile court fashioned its dispositional orders, not when it sustained the section 300 petition. Mother directs us to nothing in the appellate record that indicates that the juvenile court did not understand the law when it sustained the section 300 petition pursuant to subdivision (b).

II. *Removal of Children from Mother's Custody*

Mother argues that the juvenile court erred in removing Isis and L. from her custody at disposition. She contends that there were reasonable means to protect the children short of their removal.

A. Relevant law and standard of review

As the parties agree, we review the juvenile court's order for substantial evidence. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.)

B. Analysis

The evidence of mother's history of verbal and physical altercations with Salvador, her manipulative behavior, and her unresolved anger support the juvenile court's order removing the children from her custody. While mother suggests that DCFS should have done more to prevent their removal, DCFS repeatedly documented mother's evasiveness and failure to communicate and cooperate with the agency.

*In re Ashly F.* (2014) 225 Cal.App.4th 803 does not compel a different result. In that case, the appellate court was concerned because there was no evidence of reasonable

efforts made to prevent the children's removal. (*Id*. at p. 809.) In contrast, ample steps were taken before the children were removed from mother's custody. DCFS initiated dependency proceedings while recommending that the children remain in mother's custody. At first, the juvenile court adopted DCFS's plan and ordered that mother retain her custodial rights. Not until mother failed to appear for scheduled drug tests, failed to cooperate with DCFS, and coached Isis to make allegations against Daniel and Melody did DCFS recommend removal and the juvenile court agree.

## DISPOSITION

The juvenile court's findings and order are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
               ASHMANN-GERST


We concur:


_____, P. J.
       BOREN


_____, J.
       CHAVEZ